IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| DALE HERRERA,<br><br>        Plaintiff,<br><br>    v.<br><br>MICHAEL J. ASTRUE,[1]<br>Commissioner of Social<br>Security Administration,<br><br>        Defendant. | Case No. 2:05-CV-506 DB<br><br><br><br>**REPORT AND RECOMMENDATION** |

Before the court is an action filed by Plaintiff, Dale Herrera, asking the court to reverse the final agency decision denying Plaintiff's applications for Disability Insurance Benefits (hereafter referred to as "DIB") and Supplementary Security Income (hereafter referred to as "SSI") under Titles II and XVI of the Social Security Act.  *See* 42 U.S.C. §§ 401-434, 1381-1383c.  The Administrative Law Judge (hereafter referred to as "ALJ") found that Plaintiff was not disabled because Plaintiff

---

[1] On February 1, 2007, Michael J. Astrue became the Commissioner of Social Security.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted, therefore, for Commissioner Jo Anne B. Barnhart as the defendant in this suit.  No further action need be taken to continue this suit.  *See* 42 U.S.C. § 405(g).

was capable of making an adjustment to work that existed in significant numbers in the national economy.

Plaintiff now challenges the ALJ's decision by arguing that it is legally erroneous and it is not supported by substantial evidence.  Specifically, Plaintiff argues:  (1) the ALJ erred by failing to find Plaintiff's borderline intellectual functioning condition and multiple cervical spine disc herniations distinct and medically determinable, severe impairments; (2) substantial evidence establishes that Plaintiff's impairments meet the criteria for medical equivalence for Listings 1.02 and 1.04; (3) the ALJ erred by failing to consider the combined effect of all of Plaintiff's impairments; (3) the ALJ erred in assessing Plaintiff's residual functional capacity (hereafter referred to as "RFC").

The court has carefully considered the parties' memoranda and the complete record in this matter and concludes that oral arguments would not materially assist it in the determination of this case.  Based on the analysis set forth below, the court recommends that Plaintiff's request that the court reverse and remand the ALJ's decision be granted.

## FACTUAL BACKGROUND

Plaintiff was born on July 11, 1952.  (*See* Docket Entry #3, the certified copy of the transcript of the entire record of the administrative proceedings related to Dale Herrera (hereafter referred to as "Tr. __"), Tr. 55.)  Plaintiff received a high

school education through the special education department; however, records reveal that Plaintiff has a difficult time reading and doing math. (Tr. 23, 142, 145, 261, 264.) Plaintiff worked for over twenty years doing heavy manual labor, with almost all of his jobs being in the coal mines as a mine machine repairer, a "belt man," and a company laborer. (Tr. 76, 257-58.)

On March 27, 1991, Plaintiff was admitted to Mountain View Hospital with complaints of severe depression, a long history of alcohol abuse, and a recent history of attempted suicide by intentional overdose of a narcotic. (Tr. 139-40.) Robert J. Howell, Ph.D., found Plaintiff intellectually functioned in a low average range and diagnosed severe single-episode depression, uncomplicated alcohol withdrawal, and alcohol dependence. (Tr. 145-47.) Plaintiff received inpatient treatment between March 29, 1991, and April 16, 1991, and improved with medications and group therapy. (Tr. 148-52, 156-62.)

On April 16, 1991, Dr. Howell administered the Wechsler Intelligence Scale, which indicated Plaintiff functioned intellectually at the borderline level. (Tr. 141.) Dr. Howell noted moderate difficulties with general fund of information, arithmetic problem solving, planning and sequencing, visual-motor coordinating, short term auditory memory, vocabulary, abstract reasoning, and ability to discriminate relevant from non-relevant stimuli. (Tr. 141.) Dr. Howell also administered the Wide Range Achievement Test, which showed Plaintiff could read, spell, and

3

do math at a third grade level or less.  (Tr. 142.)  Dr. Howell
added an additional diagnosis of borderline intellectual
functioning and assigned a Global Assessment of Functioning
(hereafter referred to as "GAF") code of 20.[2]  (Tr. 142-43.)

In 1993, Plaintiff underwent a surgical fusion of his
cervical spine.  (Tr. 103, 178.)  That same year he returned to
work.  (Tr. 103, 178.)

On June 24, 2002, Plaintiff presented to Kurt King, M.D.,
with a strained right shoulder.  (Tr. 102.)

In an October 5, 2002 questionnaire, Plaintiff indicated
that he could read and write English "a little bit."  (Tr. 64.)
He said that he took over-the-counter pain medications and that
his activities included helping his friend make dinner, grocery
shopping, watering and cutting the lawn, doing laundry, and
driving a car.  (Tr. 64-68.)  He said he could not sit, stand, or
drive for a long time due to his back, neck, arm, and hand pain.
(Tr. 68.)

On November 6, 2002, Plaintiff presented to Dr. King with
complaints of hand and leg pain.  (Tr. 117.)  Dr. King found
Plaintiff did not show any guarding when he walked, and his deep

---

[2]A GAF code of 20 indicates that a person is in some danger
of hurting himself or others (e.g., suicide attempts without
clear expectation of death, and frequently violent or manic
behavior), occasional failure to maintain hygiene, or gross
impairment in communication.  *See* Diagnostic & Statistical Manual
of Mental Disorders - Text Revision (hereafter referred to as
"DSM-IV-TR") (2000).

tendon reflexes and straight leg raising tests were within normal limits.  (Tr. 117.)  Dr. King diagnosed chronic back and neck pain and prescribed Lortab, a narcotic, and Robaxin, a muscle relaxant.  (Tr. 117.)

On November 14, 2002, David R. Heiner, M.D., examined Plaintiff at the request of the State disability determination agency.  (Tr. 103-07.)  Plaintiff complained of constant pain in his neck, shoulders, and low back; numbness in his hands, hips, buttocks, legs, and toes; muscle pain and spasms; and difficulty with bending, lifting, twisting, turning, standing, sitting, walking, and traveling by car.  (Tr. 103-04.)  He also complained of pain, stiffness, and swelling in the joints, dizziness, and balance difficulties.  (Tr. 104-05.)  Dr. Heiner found Plaintiff could walk on his heels and toes and had reduced cervical and lumbosacral spine ranges of motion; cervical and thoracic paravertebral muscle tenderness; positive bilateral straight leg raise testing; shoulder impingement; acromioclavicular joint tenderness; and right knee catching and locking.  (Tr. 105-06.)  Dr. Heiner also found Plaintiff demonstrated intact sensation, motor strength, and reflexes with the exception of decreased biceps reflexes and some decreased sensation in his lower left leg and foot.  (Tr. 106.)  Dr. Heiner diagnosed right knee pain secondary to internal derangement meniscus tear; shoulder impingement syndrome and AC joint arthritis; degenerative arthritis in the lumbosacral spine with L4-5 disc disease and

left leg radiculopathy; degenerative disc disease of the cervical spine; and status post cervical fusion.  (Tr. 106.)

On December 5, 2002, Plaintiff presented to the Castleview Hospital Emergency Room with complaints of back pain after falling down at work.  (Tr. 109-13.)  Dr. King found Plaintiff had positive straight leg raising tests and diagnosed neck pain, possible arm neuropathy, and low back pain.  (Tr. 110.)

On January 3, 2003, an x-ray of Plaintiff's lumbar spine showed modest multilevel spondylosis evidenced by modest disc space narrowing at L3-4 and L4-5 and lesser changes at T12-L1 and L2-L3, and anterior osteophyte formation at L2 through L5.  (Tr. 114.)  An x-ray of Plaintiff's right knee showed mild degenerative change of the patellofemoral joint with a small effusion.  (Tr. 115.)

On January 10, 2003, Plaintiff returned to Dr. King with complaints of numbness in the arms.  (Tr. 116A.)  Dr. King noted Plaintiff had lumbar pain and a tingling sensation in the fingers, diagnosed nerve root syndrome and low back pain, and continued Plaintiff's medications.  (Tr. 116A.)

On January 13, 2003, R. Sander, M.D., a State agency physician, completed a physical RFC assessment.  (Tr. 39, 120-28.)  Dr. Sander concluded Plaintiff could meet the physical demands of the full range of light work.  (Tr. 120, 122-28.)  On March 31, 2003, Dennis Taggart, M.D., another State agency physician, affirmed Dr. Sander's findings.  (Tr. 118, 128.)

On April 17, 2003, Plaintiff was admitted to Utah State Hospital following a suicide attempt.  (Tr. 170.)  Plaintiff reported that the recent suicides of two friends and relationship difficulties with his girlfriend caused him to suffer depression, hopelessness, despondency, and to drink heavily during the preceding weeks.  (Tr. 168, 170, 176.)  Warren Stoker, D.O., found Plaintiff was cooperative and pleasant and had blunted affect, logical and goal directed speech, and fair insight and judgment.  (Tr. 172.)  Dr. Stoker noted Plaintiff was alert and oriented but was unable to complete an orientation and memory assessment because he could not read, write, or do arithmetic. (Tr. 172.)  Dr. Stoker estimated Plaintiff's intellectual functioning as low average and diagnosed depressive disorder not otherwise specified and alcohol dependence.  (Tr. 168, 172.)  He assigned Plaintiff a GAF code of 10[3] and prescribed treatment with Zyprexa, an anti-psychotic medication, and anti-depressants. (Tr. 168.)

During the admission, Plaintiff complained of chronic back pain to Dean Laney, a nurse practitioner.  (Tr. 177-80.) Plaintiff reported that his back pain lessened with rest and stretching and that he could perform activities of daily living.

---

[3]A GAF code of 10 indicates a person is in persistent danger of hurting himself or others, demonstrates persistent inability to maintain minimal personal hygiene, or engages in serious suicidal acts with clear expectation of death.  *See* DSM-IV-TR, note 4.

(Tr. 179.)  Mr. Laney found Plaintiff's spine had good ranges of motion and no deviation, swelling, or erythema.  (Tr. 178.)  He also found Plaintiff's neurological functioning, gait, balance, coordination, motor strength, and reflexes were normal.  (Tr. 178.)  Mr. Laney diagnosed chronic lower back pain and status post-cervical discectomy with fusion.  (Tr. 179.)

On April 17, 2003, Plaintiff underwent an Occupational Therapy Assessment at the Utah State Hospital.  (Tr. 189.)  Angela M. Schweitzer-Hendricks, an occupational therapist, concluded Plaintiff retained a 66 percent capacity for independent living and required 34 percent functional assistance to recognize and correct hazards in routine activities and perform activities of daily living.  (Tr. 189-90.)  She stated Plaintiff could perform a part-time job provided he performed repetitive tasks, learned new information one step at a time, and was allowed two to three times the normal amount of time necessary to complete a particular task.  (Tr. 190.)

On April 18, 2003, Dr. Stoker noted that Plaintiff was sleeping well and reported decreased anxiety, hopelessness, and suicidal thoughts.  (Tr. 185.)  Dr. Stoker found Plaintiff's symptoms were significantly improved, although he remained depressed.  (Tr. 185.)  Dr. Stoker added Effexor, an anti-depressant, to Plaintiff's medication regimen.  (Tr. 185.)

On April 21, 2003, Plaintiff complained to Bruce Bishop, a social worker, that he felt depressed, tearful, and hopeless.

8

(Tr. 196.)  Mr. Bishop provided counseling to Plaintiff.  (Tr. 196.)

On April 22, 2003, Plaintiff told Dr. Stoker he felt tearful, hopeless, worthless, disrespected, and financially pressured.  (Tr. 186.)  He expressed concern about occupational barriers posed by his limited capacity for reading and writing.  (Tr. 186.)  Dr. Stoker diagnosed depression and emotional drain and continued Plaintiff's medications.  (Tr. 186.)  Later that day, Plaintiff told Mr. Bishop his mood was improved, but he still had suicidal thoughts.  (Tr. 197.)  After Mr. Bishop counseled him, Plaintiff agreed his problems were not insurmountable.  (Tr. 197.)

On April 23, 2003, Mr. Bishop noted Plaintiff continued to present with flat affect and depressed mood.  (Tr. 198.)  Plaintiff reported discouragement about the future, low energy, and suicidal thoughts.  (Tr. 198.)  He and Mr. Bishop discussed his problems and the benefits of attending Alcoholics Anonymous.  (Tr. 198.)

On April 24, 2003, Plaintiff presented to Dr. Stoker with brighter affect and reported no suicidal thoughts during the previous two days.  (Tr. 187.)  He also reported somewhat greater energy, and better appetite and sleep.  (Tr. 187.)  Dr. Stoker diagnosed somewhat improved recurrent major depressive disorder and adjusted Plaintiff's medications.  (Tr. 187.)  Plaintiff participated in occupational therapy.  (Tr. 194.)  He also saw

Mr. Bishop, reporting improved mood and some depressive symptoms, but no suicidal thoughts. (Tr. 199.) Mr. Bishop found Plaintiff had flat affect and improved mood with medications and counseled him about the benefits of Alcoholics Anonymous. (Tr. 199.)

On April 25, 2003, Plaintiff reported an absence of suicidal thoughts, improved mood, and poor sleep to Mr. Bishop. (Tr. 200.) Mr. Bishop found Plaintiff had brighter affect and animated expressions and made arrangements for discharge. (Tr. 200.)

On April 26, 2003, Plaintiff presented to Gina Rae Lewis Stubbs, M.D., as somewhat withdrawn and dysphoric. (Tr. 188.) He reported improved mood with medications. (Tr. 188.) Dr. Lewis Stubbs diagnosed Plaintiff with depression and resolving acute suicidal ideation, and continued his medications. (Tr. 188.) Plaintiff also saw Gary Johnson, a social worker, and reported no thoughts of suicide. (Tr. 201.)

On April 29, 2003, Plaintiff's affect was bright when he saw Mr. Bishop. (Tr. 204.) Plaintiff reported he slept well, denied suicidal ideation, and stated he was ready for discharge. (Tr. 204.) Mr. Bishop instructed Plaintiff to continue medication and psychotherapy after discharge. (Tr. 204.)

On July 21, 2003, Plaintiff requested medication therapy from Valley Mental Health. (Tr. 243-44.) Plaintiff told Scott Richins, a nurse practitioner, that Effexor and Zyprexa helped his syptoms. (Tr. 243.) He also reported good appetite, energy,

and motivation; concentration and memory difficulties; and no anxiety, mania, or psychotic symptoms.  (Tr. 243.)  Mr. Richins found Plaintiff was alert and oriented with flat affect; normal speech; good eye contact; adequate motivation, insight, and judgment; and no cognitive impairment or psychotic symptoms. (Tr. 244.)  Mr. Richins concluded Plaintiff's prognosis was good, diagnosed recurrent severe major depression, and assigned a GAF code of 60.[4]  (Tr. 244.)  He continued Plaintiff's medications and prescribed Trazodone, an anti-depressant.  (Tr. 244.)

On August 5, 2003, Plaintiff told Mr. Richins he stopped taking his medications due to sedation.  (Tr. 242.)  He complained of poor sleep but denied psychotic symptoms and other medication side effects.  (Tr. 242.)  Mr. Richins found Plaintiff was alert and oriented with flat affect, good eye contact, and no psychotic symptoms, and adjusted his medications.  (Tr. 242.)

On August 19, 2003, Plaintiff told Mr. Richins his sedation was resolved and his mood 50 percent improved.  (Tr. 240.)  He denied suicidal thoughts, psychotic episodes, or other medication side effects.  (Tr. 240.)  Mr. Richins found Plaintiff was alert and oriented with somewhat brighter affect, good eye contact, and no psychotic symptoms.  (Tr. 240.)  Mr. Richins diagnosed

---

[4]A GAF code of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  *See* DSM-IV-TR, note 4.

Plaintiff with somewhat improved major depressive disorder and psychotic symptoms and possible side effects of medication, and adjusted his medications.  (Tr. 240.)

On September 9, 2003, Plaintiff told Mr. Richins that he had stopped taking all of his medications two weeks previously.  (Tr. 239.)  He stated he felt "really good" and denied problems with depression, suicidal thoughts, or loss of sleep.  (Tr. 239.)  He stated he did not want to take medications anymore.  (Tr. 239.)  Mr. Richins found Plaintiff was alert and oriented with brighter affect, good eye contact, and no psychotic symptoms.  (Tr. 239.)  He diagnosed improved depressive disorder with psychotic features and counseled Plaintiff about stopping his medications.  (Tr. 240.)

On October 9, 2003, Plaintiff presented to Robert Barth, a social worker, in crisis after visiting his girlfriend.  (Tr. 236, 239.)  He reported that he had drunk alcohol heavily while taking his psychiatric medications during the previous month and that he had recently stopped taking his medications because he "felt better."  (Tr. 236, 239.)  Mr. Barth advised Plaintiff to seek treatment for alcohol addiction.  (Tr. 239.)

On October 21, 2003, Plaintiff told Mr. Richins that he had resumed his medications and was feeling somewhat better, but that he continued to consume alcohol.  (Tr. 235.)  Mr. Richins found Plaintiff had flat affect, good eye contact, and no psychotic symptoms.  (Tr. 236.)  He diagnosed improved major depressive

disorder and alcohol abuse and adjusted Plaintiff's medications.
(Tr. 236.)

On November 4, 2003, Plaintiff reported continued use of alcohol, improved mood with medications, depressive symptoms, "pretty good" sleep, and occasional auditory hallucinations. (Tr. 234-35.)  Mr. Richins diagnosed somewhat improved depressive disorder and alcohol abuse versus dependence and adjusted Plaintiff's medications.  (Tr. 235.)

On November 20, 2003, Plaintiff saw Mr. Richins, reporting recent hospitalization due to a car accident.  (Tr. 233-34.)  He reported continued depressed mood, some sleep problems, but no suicidal ideation or psychotic symptoms.  (Tr. 233.)  Mr. Richins found Plaintiff was alert and oriented with flat affect, good eye contact, and no psychotic symptoms.  (Tr. 233-34.)  He diagnosed Plaintiff with somewhat improved major depressive disorder with psychotic features and alcohol abuse and adjusted his medications.  (Tr. 234.)

On January 8, 2004, an MRI study of Plaintiff's cervical spine showed postsurgical changes at C3-4 and C5-6; degenerative changes and moderate disc herniation at C4-5; moderate degenerative spurring, some disc space narrowing, and disc herniation at C6-7; and disc herniation at C7-T1.  (Tr. 130-31.)

On March 5, 2004, Valley Mental Health discharged Plaintiff from care due to lack of face-to-face contact.  (Tr. 232.)

13

On May 12, 2004, Virginia Wheeler, a nurse practitioner, indicated in a letter that Plaintiff's degenerative disc disease resulted in constant pain radiating into his legs.  (Tr. 132.) She also stated Plaintiff was depressed and that she treated his symptoms with medications.  (Tr. 132.)

In questionnaires submitted in June 2004, Plaintiff stated he could read and write.  (Tr. 97.)  He said he stopped working due to severe back pain and because the "job ended."  (Tr. 97.) He said he had difficulty with postural activities.  (Tr. 97.) He said he could not cook, wash dishes, mop, vacuum, or shop for groceries very long due to pain.  (Tr. 97.)  He said that he could drive.  (Tr. 98.)  Plaintiff wrote that he took a trip to Colorado that year but he did not do the driving.  (Tr. 98.)  He claimed he could not work due to numbness and pain in the legs and severe depression.  (Tr. 98.)  Plaintiff also claimed he could sit and walk for only 15 minutes, stand for 30 minutes, and needed to lie down for two hours in an eight hour workday.  (Tr. 94.)  He said that he could only lift up to ten pounds occasionally, that he could not perform simple grasping or fine manipulation with his right hand, and that he could not push or pull to operate arm controls.  (Tr. 94.)  He said he could not bend more than 20 degrees, stoop to more than 10 degrees, climb stairs without hand rails, or perform rapid or repetitive movements.  (Tr. 94.)

At the hearing before the ALJ on July 6, 2004, Plaintiff testified that he had difficulties reaching, bending, and squatting.  (Tr. 267-68.) He testified that it took him one and one-half hours to walk two block round trip.  (Tr. 268.)  He said he could sit for one and one-half hours.  (Tr. 268-69.)  He testified that he went grocery shopping for 20 to 30 minutes; walked to the post office from his home, which was a distance of half a block; and walked to his sister's house, which was a distance of four blocks.  (Tr. 269-70.)  Plaintiff stated he could not turn to the left due to neck pain, nor could he sit, stand, or climb more than six to eight stairs due to knee pain. (Tr. 272-73.)  He also said he fell because of his knee problems and that his arms became numb when he drove for more than twenty minutes.  (Tr. 273-75.)

At the July 6 hearing, the ALJ asked Terri Marshall-Gilfillan, a VE, to assume an individual of Plaintiff's age, education, and work experience who could perform unskilled light work with the following limitations:

> The individual would need to have a sitting and standing option and this would be let's say 45 minutes to one hour of sitting at one time for a total of six hours and standing or walking would be 30 to 45 minutes at one time and that also could be six hours.  And, let's see, the lifting, and the occasional lifting would be 20 pounds and frequent would be 10 pounds which I think is the standard for light work.  Also, this individual would miss up to 24 days of work per year due to health conditions.

(Tr. 276-77.)  The VE testified that with these conditions, an individual could perform the jobs of parking lot attendant and photocopy machine operator.  (Tr. 283.)

On July 22, 2004, Russell Hunt, a physician's assistant, completed a workplace functional ability medical report regarding Plaintiff in which he reported no mental limitations.  (Tr. 229-30.)

## PROCEDURAL BACKGROUND

Plaintiff applied for DIB and SSI on July 1, 2002.  (Tr. 38-39, 55-57, 75, 245-47.)  Plaintiff initially alleged an inability to work since the date of his application, but amended his alleged onset disability date to July 11, 2002, at the hearing before the ALJ.  (Tr. 252.)  After his claims were denied initially and upon reconsideration (Tr. 41-43, 46-48), Plaintiff requested a hearing before an ALJ.  (Tr. 40.)  That hearing was held on July 6, 2004.  (Tr. 249-287.)  The ALJ issued his decision denying benefits on November 23, 2004.  (Tr. 13-24.) The Appeals Council then denied Plaintiff's subsequent request for review (Tr. 3-5, 9), making the ALJ's November 23, 2004 decision the Commissioner's final decision for purposes of judicial review.  *See* 42 U.S.C. § 405(g); 20 C.F.R. §§ 404.981, 416.1481.

On June 15, 2005, after receiving the Appeals Council's denial of his request for review, Plaintiff filed his complaint and the case was assigned to United States District Judge Dee

Benson.  (Docket Entry #1.)  Defendant filed his answer and the
administrative record on August 15, 2005.  (Docket Entries #2,
3.)  Plaintiff filed his brief on February 3, 2006, Defendant
filed his response brief on March 3, 2006, and Plaintiff filed
his reply brief on March 17, 2006.  (Docket Entries #6, 8, 10.)

On March 13, 2006, Judge Benson referred the case to United
States Magistrate Judge Samuel Alba pursuant to 28 U.S.C. §
636(b)(1)(B).  (Docket Entry #9.)

**ANALYSIS**

**A.  The Five-step Disability Evaluation**

The Social Security Act defines "disability" as the
"inability to engage in any substantial gainful activity by
reason of any medically determinable physical or mental
impairment which can be expected to result in death or which has
lasted or can be expected to last for a continuous period of not
less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Further, an
individual shall be determined disabled "only if his physical or
mental impairment or impairments are of such severity that he is
not only unable to do his previous work but cannot, considering
his age, education, and work experience, engage in any other kind
of substantial gainful work which exists in the national
economy."  *Id.* § 423(d)(2)(A).

A person seeking Social Security benefits bears the burden
of proving that because of his disability, he is unable to
perform his prior work activity.  *See Andrade v. Secretary of*

17

*Health and Human Servs.*, 985 F.2d 1045, 1050 (10ᵗʰ Cir. 1993);
*Musgrave v. Sullivan*, 966 F.2d 1371, 1376 (10ᵗʰ Cir. 1992);
*Gossett v. Bowen*, 862 F.2d 802, 804 (10ᵗʰ Cir. 1988).  Once the
claimant establishes that he has such a disability, the burden
shifts to the Commissioner to prove that the claimant retains the
ability to do other work and that jobs which he can perform exist
in the national economy.  *See Rutledge v. Apfel*, 230 F.3d 1172,
1174 (10ᵗʰ Cir. 2000); *Gossett*, 862 F.2d at 804.

The Commissioner has established a five-step sequential
evaluation process for determining whether a person is disabled.
*See* 20 C.F.R. § 404.1520 (2003); *id.* § 416.920; *see also Bowen v.
Yuckert*, 482 U.S. 137, 140 (1987); *Gossett*, 862 F.2d at 805;
*Williams v. Bowen*, 844 F.2d 748, 750-51 (10ᵗʰ Cir. 1988).  "If a
determination can be made at any of the steps that a claimant is
or is not disabled, evaluation under a subsequent step is not
necessary."  *Williams*, 844 F.2d at 750; *accord, Jozefowicz v.
Heckler*, 811 F.2d 1352, 1355 (10ᵗʰ Cir. 1987).

Step one of the evaluation process provides that a claimant
who is working is not disabled, regardless of that person's
medical condition, age, education and work experience, if it is
determined that the work constitutes "substantial gainful
activity."  20 C.F.R. § 404.1520(b); *id.* § 416.920(b); *accord
Williams*, 844 F.2d at 750.  If the claimant is not engaged in
substantial gainful activity, then the decision maker must

18

proceed to step two to determine whether the claimant has an impairment or combination of impairments severe enough to limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c); *id.* § 416.920(c).  A determination of this issue is based on medical factors alone.  *See id.; Williams*, 844 F.2d at 751.

A finding of a severe impairment leads the decision maker to step three to determine whether the claimant's impairment meets the durational requirement and is listed in Appendix 1 of Subpart P, 20 C.F.R. § 404, or is equal to a listed impairment.  *See* 20 C.F.R. § 404.1520(d); *id.* § 416.920(d).  If the claimant's impairment, or the equivalent thereof, is listed, the claimant is presumed to be disabled.  *See id.* §§ 404.1520(d), 416.920(d).  If the impairment is not listed, the decision maker proceeds to step four.  At this level, the decision maker looks at past relevant work performed by the claimant.  If the claimant is able to perform work he has done in the past, he is not disabled.  *See id.* § 404.1520(e), (f); *id.* § 416.920(e), (f).

Fifth, if the claimant is unable to perform past relevant work, the decision maker completes the evaluation by turning to step five.  At this step, where the claimant's impairment is so severe that it precludes him from performing work he has done in the past, he is deemed disabled unless it can be established that "the claimant retains the capacity 'to perform an alternative work activity and that this specific type of job exists in the

19

national economy.'"  *Williams*, 844 F.2d at 751 (quoting *Channel*
*v. Heckler*, 747 F.2d 577, 579 (10th Cir. 1984)); *see also* 20
C.F.R. § 404.1520(g); *id.* § 416.920(g).

Having examined the five-step process decision makers follow
in evaluating whether an applicant is entitled to DIB and SSI,
the court next examines the ALJ's decision in this case.

## B.   The ALJ's Decision

Because the Appeals Council denied Plaintiff's request for
review, the ALJ's decision is the Commissioner's final decision
in this case.  *See* 42 U.S.C. § 405(g).  Therefore, the Court
examines the ALJ's decision.

The ALJ followed the five-step analysis in reaching his
decision.  First, the ALJ found that Plaintiff had not engaged in
any substantial gainful activity since his alleged onset date.
(Tr. 14.)  Second, the ALJ found that Plaintiff had severe
impairments consisting of:  (1) right knee pain secondary to an
internal derangement meniscus tear; (2) a shoulder impingement
syndrome with AC joint arthritis and a possibly enlarged anterior
acromion causing impingement; (3) degenerative arthritis of the
lumbar spine with suspected L4-5 disc disease with left leg
radiculopathy; (4) degenerative disc disease of the cervical
spine status post a cervical fusion with residual weakness of the
bicep; (5) a long history of depression with two epi[s]odes of
suicide attempts back in 1991 and again in 2003; and (6) a
history of alcohol dependence.  (Tr. 15.)  Third, the ALJ found

that Plaintiff's impairments, either singly or in combination, did not meet or equal a listed impairment.  (Tr. 15.)

Fourth, the ALJ found that Plaintiff did not retain the RFC to perform his past relevant work.  (Tr. 21.)  However, in the final step of his analysis, the ALJ found that Plaintiff was capable of making a successful adjustment to work that exists in significant numbers in the national economy, and that Plaintiff, therefore, is not disabled.  (Tr. 22.)

Specifically, the ALJ made the following findings:

1.  The claimant meets the non-disability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.
2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.
3.  The claimant's right knee pain secondary to an internal derangement meniscus tear, shoulder impingement syndrome with AC joint arthritis with a possibly enlarged anterior acromion causing impingement, degenerative arthritis of the lumbar spine with suspected L4-5 disc disease with left leg radiculopathy, degenerative disc disease of the cervical spine status post a cervical fusion with residual weakness of the bicep, a long history of depression with two epi[s]odes of suicide attempts in 1991 and again in 2003 and a history of alcohol dependence are considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(b).
4.  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.  The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6.  The claimant has the following residual functional capacity to perform light exertional work with the ability to: lift and/or carry 20 pounds occasionally and 10 pounds frequently, sit in 45 to 60-minute increments for a total of 6 hours and stand/walk in 30 to 45-minute increments for a total of 6 hours in an 8-hour workday.  He would also be expected to miss up to 24 days of work in a year's time.

7.  A review of the evidence shows the claimant has an alcohol abuse disorder, which the undersigned finds is "not" a contributing factor material to the determination of disability (20 CFR § 404.1535 and 416.935).

8.  The claimant is unable to perform any of his past relevant work (20 CFR §§ 404.1565 and 416.965).

9.  The claimant is an "individual closely approaching advanced age" (20 CFR §§ 404.1563 and 416.963).

10.  The claimant has "a limited education" (20 CFR §§ 404.1564 and 416.964).

11.  The claimant has the residual functional capacity to perform a significant range of light work (20 CFR §§ 404.1567 and 416.967).

12.  Although the claimant's exertional limitations do not allow him to perform the full range of light work, using Medical-Vocational Rule 202.11 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs include work as a parking lot attendant, DOT 915.473-010, a light/unskilled job, with 116,000 jobs available in the national economy; and a photo copy machine operator, DOT 207.685-014, a light/unskilled job, with 18,000 jobs available in the national economy.

13.  The claimant was not under a
     "disability," as defined in the Social
     Security Act, at any time through the
     date of this decision (20 CFR §§
     404.1520(g) and 416.920(g)).

(Tr. 22-23.)

### C.  Standard of Review

The court reviews the Commissioner's decision "to determine
whether the factual findings are supported by substantial
evidence and whether correct legal standards were applied."
*Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003); *accord
Angel v. Barnhart*, 329 F.3d 1208, 1209 (10th Cir. 2003).

The Commissioner's findings, "if supported by substantial
evidence, shall be conclusive."  42 U.S.C. § 405(g).
"'Substantial evidence is "such relevant evidence as a reasonable
mind might accept as adequate to support a conclusion."'"  *Doyal*,
331 F.3d at 760 (citations omitted).  "'Substantial evidence'
requires 'more than a scintilla, but less than a preponderance,'
and is satisfied by such relevant 'evidence that a reasonable
mind might accept to support the conclusion.'"  *Gossett v. Bowen*,
862 F.2d 802, 804 (10th Cir. 1988) (citation omitted).  "'Evidence
is not substantial "if it is overwhelmed by other evidence--
particularly certain types of evidence (e.g., that offered by
treating physicians)--or if it really constitutes not evidence
but mere conclusion."'"  *Id.* at 805 (citations omitted); *see also
O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994) ("Evidence is
insubstantial if it is overwhelmingly contradicted by other

23

evidence."); *Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992) ("A finding of '"no substantial evidence" will be found only where there is a "conspicuous absence of credible choices" or "no contrary medical evidence."'"  (Citations omitted.)).

In conducting its review, the court "must examine the record closely to determine whether substantial evidence supports" the Commissioner's decision.  *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).  The court may "'neither reweigh the evidence nor substitute [its] judgment for that of the agency.'"  *White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001) (citation omitted). However, the court is not required to mechanically accept the Commissioner's findings.  *See Ehrhart v. Secretary of Health & Human Servs.*, 969 F.2d 534, 538 (7th Cir. 1992) ("By the same token, we must do more than merely rubber stamp the decisions of the [Commissioner].").  Rather, the court must "'examine the record as a whole, including whatever in the record fairly detracts from the weight of the . . . [Commissioner's] decision and, on that basis, determine if the substantiality of the evidence test has been met.'"  *Glenn v. Shalala*, 21 F.3d 983, 984 (10th Cir. 1994) (citation omitted).  The court's review of the record includes any evidence Plaintiff presented for the first time to the Appeals Council.  *See O'Dell*, 44 F.3d at 858-59.

The court typically defers to the ALJ on issues of witness credibility.  *See Hamilton v. Secretary of Health & Human Servs.*, 961 F.2d 1495, 1499 (10th Cir. 1992).  Nonetheless, "'[f]indings

as to credibility should be closely and affirmatively linked to substantial evidence.'" *Winfrey*, 92 F.3d at 1020 (citation omitted).

The court's review also extends to determining whether the Commissioner applied the correct legal standards. *Qualls v. Apfel*, 206 F.3d 1368, 1371 (10th Cir. 2000). Besides the lack of substantial evidence, reversal may be appropriate where the Commissioner uses the wrong legal standards or the Commissioner fails to demonstrate reliance on the correct legal standards. *See Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994); *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993); *Andrade v. Secretary of Health and Human Servs.*, 985 F.2d 1045, 1047 (10th Cir. 1993).

### D. Plaintiff's Arguments

Plaintiff asserts four major arguments. First, Plaintiff argues the ALJ erred by failing to find Plaintiff's borderline intellectual functioning condition and multiple cervical spine disc herniations distinct and medically determinable, severe impairments. Second, Plaintiff argues substantial evidence establishes that Plaintiff's impairments meet the criteria for medical equivalence for Listings 1.02 and 1.04. Third, Plaintiff argues the ALJ erred by failing to consider the combined effect of all of Plaintiff's impairments. Fourth, Plaintiff challenges the ALJ's RFC assessment. The court addresses each of these arguments in turn.

**1.   The ALJ's Severe Impairment Findings at Step 2**

At step two of the five-step analysis, the ALJ found Plaintiff suffered from six severe impairments.[5]  Plaintiff argues that the ALJ also should have found Plaintiff's borderline intellectual functioning and cervical disc herniations to be distinct medically determinable severe impairments.

A claimant bears the burden at step two to present evidence that he has a medically severe impairment or combination of impairments.  *See Bowen v. Yuckert*, 482 U.S. 137, 146 & n.5 (1987).  Although the Tenth Circuit has referred to the claimant's necessary showing as "de minimis," the Tenth Circuit has clarified that the claimant "must show more than the mere presence of a condition or ailment."  *Hinkle v. Apfel*, 132 F.3d 1349, 1351 (10th Cir. 1997) (quotation omitted).

The ALJ's step two task is to determine, based on the record, whether the claimant has a medically severe impairment or combination of impairments.  *See* 20 C.F.R. § 404.152(c).  An impairment is "not severe if it does not significantly limit [a

---

[5]As set forth above, the six severe impairments found by the ALJ included: (1) right knee pain secondary to an internal derangement meniscus tear; (2) a shoulder impingement syndrome with AC joint arthritis and a possibly enlarged anterioracromion causing impingement; (3) degenerative arthritis of the lumbar spine with suspected L4-5 disc disease with left leg radiculopathy; (4) degenerative disc disease of the cervical spine status post a cervical fusion with residual weakness of the bicep; (5) a long history of depression with two epi[s]odes of suicide attempts back in 1991 and again in 2003; and (6) a history of alcohol dependence.  (Tr. 15.)

claimant's] ability to do basic work activities." 20 C.F.R. § 404.1521(a); *see also* 20 C.F.R. §§ 404.1520(c), 416.920(c), SSR 96-3p, SSR 85-28. Basic work activities are the "abilities and aptitudes necessary to do most jobs," and include the facility to understand, remember, and carry out simple instructions; to use judgment; to respond appropriately to supervisors, co-workers, and usual work situations; and to deal with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b)(3)-(6).

Turning to Plaintiff's argument regarding his borderline intellectual functioning, Plaintiff argues the ALJ erred by not finding that his borderline intellectual functioning is a severe impairment. In 1991, Plaintiff was tested to have "Borderline Intellectual Functioning" (full-scale IQ of 75) with no significant differences between his verbal IQ (72) and his performance IQ (79). (Tr. 141.) He was tested to have serious deficits in short-term auditory memory, vocabulary words, abstract reasoning skills, and his ability to discriminate relevant from non-relevant stimuli. (Tr. 141.) Results from the Wide-Range Achievement Test (Revised) showed Plaintiff's performance was significantly below average, showing he failed to comprehend much of what he had been taught in school. (Tr. 142.) Plaintiff tested at less than a third grade equivalent for reading, less than a third grade equivalent for spelling, and an end of third grade equivalent for arithmetic. (Tr. 142.)

Defendant argues that the ALJ did not err because these 1991 tests are old; that they are the only medical documentation of Plaintiff's borderline intellectual functioning; that after these 1991 tests were performed, Plaintiff returned to substantial gainful activity for many years; and that there was no medical evidence from the relevant time period, July 11, 2002, to November 23, 2004, to suggest Plaintiff's borderline intellectual functioning resulted in any functional limitations precluding him from performing unskilled light work.

The court rejects Defendant's arguments.  The test in determining whether an impairment is severe is not whether it prevents any gainful activity; instead, it is whether the impairment significantly limits the claimant's ability to do basic work activities.  Further, Defendant has not cited to any law or regulation supporting that the ALJ should discount evidence presented by the claimant merely because it is older evidence.  In this case, Plaintiff presented the 1991 psychological evaluation diagnosing Plaintiff with borderline intellectual functioning.  No other medical evidence in the record contradicts that diagnosis.  As a result, the ALJ erred by not properly considering the diagnosis, and his step two finding is not supported by substantial evidence.

Next, the court turns to Plaintiff's argument regarding his cervical spine disc herniations.  Plaintiff argues that the ALJ erred by not finding that his cervical disc herniations are a

28

severe impairment.  Plaintiff bases his argument on the January 2004 MRI scans of Plaintiff's cervical spine, which showed three separate disc herniations:  at C4-5, at C6-7, and at C7-T1.  (Tr. 130-31.)  Each of those herniated discs were effacing the thecal sac.  (Tr. 130-31.)  Separately, Dr. Compton determined there were osteophyte formations at C4-5 and C6-7, evidence of degenerative disc disease.  (Tr. 130-31.)

Defendant argues that the ALJ's finding is supported by substantial evidence because no physician opined that Plaintiff's herniated discs resulted in any functional limitations.  However, as discussed in Section 3 below, the ALJ failed to properly develop the record, including discovering whether the 2004 MRI indicated functional limitations.  As a result, the court concludes that the ALJ's severe impairment finding also is not supported by substantial evidence because of the lack of medical evidence regarding Plaintiff's functional limitations resulting from his herniated discs.  On remand, after receiving the medical opinion evidence required by Section 3 below, the ALJ should reevaluate whether Plaintiff's herniated discs amount to a severe impairment.

**2.  Whether Plaintiff's Impairments Meet the Criteria for Medical Equivalence for Listings 1.02 and 1.04 and Whether the ALJ Properly Considered the Combined Effects of Plaintiff's Impairments**

Plaintiff also argues that his conditions of cervical spine degenerative disc disease, three disc herniations in his cervical spine, shoulder impingements, lumbosacral disc disease, internal derangement of his right knee, in combination with his depression and borderline intellectual functioning, satisfy the criteria for medical equivalence of Listing 1.02, Major Dysfunction of a Joint, and Listing 1.04, Disorders of the Spine.

Under the regulations, medical equivalence can be established if medical findings show an impairment is "equal in severity and duration to the listed findings." *See* 20 C.F.R. §§ 404.1526(a), 416.926(a). If a claimant's impairment is not listed, his impairment is compared with the listed impairment most like his impairment to determine if it is medically equal. *See id.* If the claimant has more than one impairment and none of them meets or equals a listing, the combination of his impairments will be considered to determine if they are equal to a listed impairment. *See id.*

The ALJ's reevaluation of his step two severe impairment finding may affect his finding regarding whether Plaintiff's impairments are medically equivalent to a listed impairment. The court therefore instructs the ALJ on remand to reevaluate whether Plaintiff's impairments meet or equal a listed impairment after the ALJ reevaluates step two of the disability analysis.

In addition, Plaintiff argues that the ALJ erred by failing to consider the combined effect of all of Plaintiff's impairments

30

as required by 42 U.S.C. § 423(d)(2)(B). *See also* 20 C.F.R. § 404.1523. As with Plaintiff's argument regarding whether his impairments meet or equal a listed impairment, the court concludes that the ALJ's reevaluation of his step two finding, and that the ALJ's further development of the record as required below, will likely affect the ALJ's evaluation of the combined effect of Plaintiff's impairments. As a result, the court does not address further Plaintiff's argument but instead notes that the ALJ should carefully consider the combined effect of all of Plaintiff's impairments in light of any new evidence received and findings made on remand.

### 3.  RFC Assessment

Finally, Plaintiff argues that the ALJ erred in determining Plaintiff's RFC. Plaintiff challenges the ALJ's RFC assessment in many ways, including by arguing that the ALJ improperly found that Plaintiff could perform "light work," that the ALJ improperly determined Plaintiff's educational level, and that the ALJ failed to properly develop the record.

An ALJ must make specific RFC findings. *See Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). Those findings must be supported by substantial evidence. *See Haddock v. Apfel*, 196 F.3d 1084, 1088 (10th Cir. 1999). In addition,

> The RFC assessment must include a narrative
> discussion describing how the evidence
> supports each conclusion, citing specific
> medical facts . . . and nonmedical evidence.
> . . . In assessing RFC, the adjudicator must

> discuss the individual's ability to perform
> sustained work activities in an ordinary work
> setting on a regular and continuing basis . .
> . and describe the maximum amount of each
> work-related activity the individual can
> perform based on the evidence available in
> the case record.  The adjudicator must also
> explain how any material inconsistencies or
> ambiguities in the evidence in the case
> record were considered and resolved.

Soc. Sec. R. 96-8p, 1996 WL 374184, at *7.  Having carefully

examined the ALJ's RFC analysis, the court concludes the ALJ

failed to follow these requirements.

For example, the ALJ determined that Plaintiff has a

"limited education."  (Tr. 14.)  A limited education "means

ability in reasoning, arithmetic, and language skills, but not

enough to allow a person with these educational qualifications to

do most of the more complex job duties needed in semi-skilled or

skilled jobs."  20 C.F.R. § 404.1564(b)(3).  Limited education is

generally considered that received in formal education at a

seventh to eleventh grade level. *See id.*

However, a significant inconsistency in the record exists

regarding this finding.  As part of an April 1991 psychological

evaluation, Plaintiff tested at less than a third grade level in

reading, at less than a third grade level in spelling, and at an

end of third grade level in arithmetic.  (Tr. 142.)  Such

evidence corresponds with that of a "marginal education," which

"means ability in reasoning, arithmetic, and language skills

which are needed to do simple, unskilled types of jobs," and is

generally considered that received in formal schooling at a sixth grade level or less.  20 C.F.R. § 404.1564(b)(2).  Defendant argues that the ALJ's questioning did not establish less than a "limited" education.  (Tr. 141-43, 261-64.)  However, the court has reviewed the transcript of the questioning, and examined the exhibit to which the ALJ and Defendant refer. (Tr. 100, 261-64.) The exhibit lacks any notations or explanations of how Plaintiff's performance at the hearing led the ALJ to conclude that Plaintiff's educational level was "limited," precluding this court from conducting any meaningful review of the ALJ's educational finding.  Thus, the court is simply left with the ALJ's questioning of Plaintiff at the hearing, with no analysis or explanation of how the ALJ reached his finding of "limited education."   In addition, the ALJ provided the court with no explanation as to why the admittedly old, but carefully conducted and documented April 1991 psychological evaluation, placing Plaintiff at a third grade level or below, was ignored.

Another example of the ALJ's failure to properly assess Plaintiff's RFC is revealed in the way the ALJ discusses and evaluates Plaintiff's physical impairments.  For instance, the ALJ notes, in his analysis:

> Another important factor noted by the
> undersigned was that there was very little in
> the way of progress records pertaining to the
> claimant's physical impairments as to assist
> the undersigned in determining the full
> extent of his impairments and resulting
> limitations.  A consultative examination was

33

> performed in November of 2002, followed by x-rays in January 2003 and MRI's in January of 2004.  These findings confirmed severe problems, but the problems were not so severe as to cause significant deficits in sensory, reflex and muscle strength testing. Furthermore, there was no supporting physical examination findings or a physician's statements as to the extent of the claimant's impairments and functional ability.  As the undersigned is forced to go by the evidence presented, that evidence shows an ability to perform less exertional work in the range of light work.

(Tr. 19-20.)  Thus, the ALJ essentially admits that the record is not complete, that it fails to provide him with a recent medical consultation that evaluates Plaintiff's specific abilities, and that the ALJ is basing his decision on a faulty record.

The ALJ must "make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC."  Soc. Sec. R. 96-8p, 1996 WL 374184, at *5.  Because the disability hearing is nonadversarial, an ALJ is obligated to develop the record even where, as here, the claimant is represented by counsel.  *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997);  *Thompson v. Sullivan*, 987 F.2d 1482, 1492 (10th Cir. 1993).  "Even though [Plaintiff's] counsel did not request any additional record development, the need for additional evidence is so clearly established in this record that the ALJ was obliged to obtain more evidence regarding [Plaintiff's] functional limitations."  *Fleetwood v. Barnhart*, 2007 WL 18922, at *4 (10th Cir. 2007) (unpublished).

The ALJ must contact the treating doctor or doctors to determine if additional needed information is available when evidence from the claimant's treating doctor or doctors is inadequate to determine if the claimant is disabled.  *See* 20 C.F.R. § 404.1512(e)(1) ("We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved [or] the report does not contain all the necessary information[.]"); *id.* § 416.912(e)(1) (same); *see also White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2002) (recognizing ALJ's obligation to contact treating physician whenever information received from physician is inadequate).  If recontacting the treating doctor or doctors still does not provide substantial evidence upon which to base an accurate RFC finding, the ALJ may order a consultative examination.  *See* 20 C.F.R. §§ 404.1512(f), 404.1519a, 416.912(f), 416.919a.

The court therefore concludes that the ALJ's RFC assessment was not based on substantial evidence.  Therefore, the court recommends that the ALJ's decision be reversed and remanded for further administrative proceedings.

**RECOMMENDATION**

Because the court concludes that the ALJ's severe impairments finding and RFC assessment are not based on substantial evidence, **IT IS HEREBY RECOMMENDED** that the ALJ's decision be **REVERSED AND REMANDED** for further administrative

proceedings.  On remand, the ALJ should reevaluate which of Plaintiff's impairments are severe, as discussed above.  In addition, the ALJ should obtain a current evaluation of Plaintiff's functional limitations from his treating doctor or doctors and/or a detailed evaluation from a consulting doctor who personally examines Plaintiff.  Further, as discussed above, the ALJ should reevaluate his other findings in light of a new severe impairments step two finding and in light of new evidence received on remand.

Copies of the foregoing report and recommendation are being mailed to the parties who are hereby notified of their right to object to the same.  The parties are further notified that they must file any objections to the report and recommendation, with the clerk of the district court, pursuant to 28 U.S.C. § 636(b), within ten (10) days after receiving it.  Failure to file objections may constitute a waiver of those objections on subsequent appellate review.

DATED this 29th day of March, 2007.

BY THE COURT:


Samuel Alba
United States Chief Magistrate Judge